# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**SHEILA JOHNSON**,

        Plaintiff,

                                      No. 14-CV-13121

vs.                                      Hon. Gerald E. Rosen

                            Magistrate Judge R. Steven Whalen

**FIFTH THIRD BANK**,

        Defendant.

_____/

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff Sheila Johnson was employed by Defendant Fifth Third Bank as a "Financial Center Manager" from May 2007 until her termination on May 2, 2014. Plaintiff filed this retaliation and discrimination suit on August 13, 2014, alleging violations of the Family Medical Leave Act and Elliott Larsen Civil Rights Act. Defendant asserts that Plaintiff's termination resulted from her long term failure to meet required sales goals, while Plaintiff maintains that it was motivated by her April 2014 request to take leave for surgery in November 2014, as well as by her gender and age.

1

Currently before the Court is Defendant's Motion for Summary Judgment (Dkt. # 18).  Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide the motion "on the briefs." *See* L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Sheila Johnson began her employment with Defendant Fifth Third Bank on May 5, 2007, working at the bank's Beecher and Ballenger branch in Flint, Michigan as a "Financial Center Manager" under Bobbi Jo Lucas, a Regional Manager.  Johnson Dep., Dkt. # 18-2, at 93.  The two had previously worked together at Chase Bank, and when Plaintiff decided to leave Chase, she telephone Lucas, who recruited her to Fifth Third.  *Id.* at 12-13.  Though the parties do not clearly articulate what Plaintiff's responsibilities were as a Financial Center Manager, her job involved managing bankers working underneath her who were involved in the direct sales of Fifth Third products and services.  *Id.* at 106.

Starting in 2011, Johnson experienced substantial difficulties in meeting the sales goals set for her.  On October 4, 2011, Plaintiff was issued a "Performance

Counseling" -- a sort of written warning -- regarding her sales numbers in the immediately preceding month. Oct. 4, 2011 Performance Counseling for Sheila Johnson, Dkt. # 18-3. That document indicates that Plaintiff was expected to meet a sales goal of "a minimum of 85% [of the monthly goal] each month," but failed do so between May and September, with her numbers during those months fluctuating between 68% and 33%.[1] *Id.* The form further states, "We must see sustained an ongoing improvement immediately. Continued failure to achieve and maintain a satisfactory performance level . . . could lead to further corrective action, up to and including termination of your employment." *Id.* Plaintiff received a nearly identical Counseling on June 16, 2012, with sales numbers during the five months prior between 36% and 72% of the monthly goals set for her. June 13, 2012 Performance Counseling for Sheila Johnson, Dkt. # 18-4.

Following the second Performance Counseling, Plaintiff transferred to the Fenton, Michigan branch of Fifth Third Bank and switched positions, taking on a role as a personal banker. Johnson Dep., at 98; Bobbi Jo Lucas Decl., Dkt. # 18-5, ¶ 4. Plaintiff testified at her deposition that this switch was a "demotion," that it was "pretty much presented to [her] that it would be in her best interest" to transfer and change positions, and that the change reduced her pay. Johnson Dep., at 98.

---

[1] The parties do not clearly define what these percentages mean, but the Court is able to infer from the documents that they indicate the percentage of sales made as compared to a monthly goal set by a supervisor.

In Lucas's view, the switch should have been Plaintiff's "ticket to success" because she "would be able to focus 100% on sales rather than leadership responsibilities" and "the Fenton branch was in a more affluent area than the Beecher and Ballenger branch." Lucas Decl. ¶ 4. At the Fenton branch, Plaintiff worked under David Engstrom, who carried out the Financial Center Manager role that Plaintiff was responsible for at the Beecher and Ballenger branch.

Plaintiff's sales did not immediately improve. She received another Performance Counseling on October 17, 2012 based on sales in August and September that only met 66% and 33% of the branch's goals. Oct. 17, 2012, Performance Counseling for Sheila Johnson, Dkt. # 18-6. That Counseling further indicated that "the minimum expected percent to goal for . . . October will be 80% to avoid further performance counseling." *Id.* Plaintiff then improved her performance, apparently meeting sales goals for the remainder of the year. However, she received two more Performance Counselings in June and July of 2013. The June Performance Counseling indicates that Plaintiff did not reach 60% of her sales during any of the first five months of 2013, and required her to meet at least 70% of her goal by the end of June. June 17, 2013, Performance Counseling for Sheila Johnson, Dkt. # 18-7. She met only 47% of her goal in June, however, and was issued another Performance Counseling on July 9, 2013. July 9, 2013 Performance Counseling for Sheila Johnson, Dkt. # 18-8.

4

These latest issues prompted a meeting between Plaintiff and Marry Sissen, an "Employee Relations Consultant" at Fifth Third, on July 23, 2013. Mary Sissen Decl., Dkt. # 18-10, ¶¶ 2-4. At that meeting Plaintiff informed Sissen of "a number of serious personal issues that had been affecting [Plaintiff's] ability to perform her job," including depression, for which Plaintiff had recently begun taking anti-depressants, and the fact that she had many care responsibilities for her siblings, children, and other immediate family. *Id.* ¶ 5; *see also* Johnson Dep., at 19-20, 30-31 (describing various family health and stability problems); Sissen Meeting Notes, Dkt. # 18-11. Following the meeting, Plaintiff's performance once again improved -- she was above 70% of her sales goals until December 2013. Jennifer Polakoff Decl., Dkt. # 18-12, ¶ 3. At that point, however, her sales once again dwindled, dipping below 50% in January 2014. *Id.* Plaintiff attributed this to general difficulties at the branch, noting that "very few bankers in the region were meeting their goals for January and February." Johnson Dep., at 133.

Plaintiff's early 2014 sales problems triggered further discussions within Fifth Third Bank regarding Plaintiff's future. On February 13, 2014, Engstrom had a telephone conversation with Jennifer Polakoff, another Employee Relations Consultant with Fifth Third Bank. According to Polakoff, during that conversation, Engstrom told her that "he was prepared to terminate the employment of [Plaintiff] if she failed to reach 85% of her sales goals in

February."  Polakoff Decl., Dkt. # 18-11, ¶ 4; *see also* E-mail from Jennifer Polakoff to Bobbi Lucas (Feb. 13, 2014),  Dkt. # 18-12.  Around this time, Lee Hotchkiss, who had replaced Lucas as Regional Manager, had several conversations with Engstrom, Polakoff, and Lucas that involved Plaintiff's performance, including at least one in January 2014 in which they discussed whether to terminate Plaintiff.  Lee Hotchkiss Dep., Dkt. # 18-13, at 10-12.  After this, Plaintiff's February sales reached 76% of her goal, and she was not terminated.  Polakoff Dep. ¶ 4.

In early March 2014, Plaintiff received her annual performance review.  She was given "above expectations" or "meets expectations" reviews in some of categories, including accountability, integrity, and respect & inclusion, but notably, she was given a "far below expectations" rating in sales productivity and a "below expectations" rating in other performance measures, which likely contributed to her overall "below expectations" grade.  2013 Performance Management for Sheila A. Johnson, Dkt. # 18-15.  In March 2014, Plaintiff's sales numbers were again low, and Engstrom met with her several times to explain to her that she needed to improve her numbers, though it does not appear that he said she would be terminated if her numbers failed to immediately improve.  *See* Johnson Dep., at 147-48; Engstrom Dep., at 39-40.

6

The events most critical to this litigation occurred in the following two months. In mid-April 2014, Plaintiff informed Engstrom that she "would be having bariatric surgery in November" and "would be off anywhere from . . . two to six weeks." Johnson Dep., at 141. She told Engstrom this because she felt that "the sooner you know these things the better for scheduling." *Id.* at 142. Plaintiff did not fill out any FMLA paperwork or file a formal request for leave. Plaintiff testified that, following her conversation with Engstrom, she "started feeling like [she] was brushed, rushed, and browbeaten." *Id.* at 142. Then, on April 29, Engstrom called Polakoff to discuss Plaintiff's performance. Polakoff Decl. ¶ 7. According to Polakoff, they "discussed [Plaintiff's] potential discharge if she failed to reach 70% of her sales goal for April." *Id.*

Plaintiff's sales for April reach 64%. *Id.* ¶ 4. Engstrom, Hotchkiss, and a human resources representative then met in the first week of May and elected to terminate Plaintiff. Engstrom Dep., at 31-33; According to Engstrom and Hotchkiss, the decision was made based solely on Plaintiff's poor sales performance, which were the lowest in the "Northwest Region" at the time of her termination. *Id.*; *see also* Hotchkiss Dep., Dkt. # 18-14, at 12-13; Polakoff Decl. ¶ 10. Polakoff approved the decision, also based on the understanding that Plaintiff's performance "had not improved as a result of previous counseling and coaching." Polakoff Decl. ¶ 9. Plaintiff was subsequently informed, on May 5, of

7

her termination effective immediately. Plaintiff was not offered any opportunity to resign after the decision was made to terminate her.

Around the same time, Engstrom and others at Fifth Third had also decided to terminate Thomas Lynch, another personal banker at the Fenton Branch. Lynch was apparently terminated because he had incorrectly approved a check that could have caused Fifth Third to lose approximately $40,000. Engstrom Dep., at 35. Engstrom characterized this as "an issue that occurred very much out of the blue" and was "something that was very unexpected for [Lynch] because it was a very different category of termination than sales production." *Id.* Because of the nature of Lynch's mistake, Engstrom said, "we wanted to give him the opportunity to resign," and they did so. *Id.* Plaintiff and Lynch were both replaced by younger employees, though Plaintiff admitted at her deposition that she had no reason beyond that to believe that age was a factor in her discharge, and Engstrom testified that because he "lost two bankers back-to-back" he couldn't say "one specifically replaced Sheila and one specifically replaced Tom." Johnson Dep., at 159; Engstrom Dep., at 35.

Plaintiff brought suit in this Court on August 13, 2014. Pl.'s Compl., Dkt. # 1. She alleges three counts relating to her termination. First, she alleges that Defendant "interfered with Plaintiff's exercise or attempt to exercise her rights to take qualifying medical leave . . . and/or retaliated against Plaintiff in violation

8

of" the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count I).  *Id.* ¶¶ 32-49.  Second, she asserts that because "Defendant replaced Plaintiff with a substantially younger employee," it engaged in age discrimination, in violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (Count II).  *Id.* ¶¶ 50-62.  Third, she asserts that because she was not given the opportunity to resign her position, unlike Mr. Lynch, Defendant engaged in gender discrimination, in violation of the Elliott-Larsen Civil Rights Act (Count III).  *Id.* ¶¶ 63-75.  Defendant has now filed for summary judgment on all three Counts. Dkt. # 18.

## III. DISCUSSION

### A.    Rule 56 Standard

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In addition,

where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.    Analysis

### 1.    Retaliatory Discharge Claim

Plaintiff's Complaint is somewhat ambiguous as to whether it alleges a claim of interference under the FMLA, 29 U.S.C. § 2615(a)(1), retaliation under the FMLA, *id.* § 2615(a)(2), or both. *See, e.g., Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (describing the elements required for each type of claim). Plaintiff's briefing on this Motion makes clear, however, that her allegations rest

10

purely on a retaliation theory.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., Dkt. #

20, at 10-14.  Accordingly, the Court proceeds under this Circuit's established law

regarding FMLA retaliation.[2]

Plaintiff's claim is governed by the familiar analytical framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The first stage of that

analysis requires the plaintiff to establish a *prima facie* case of discrimination.  If

she is able to do so, "the burden then must shift to the employer to articulate some

legitimate, nondiscriminatory reason" for the employer's conduct.  *Id.* at 802.  If

the employer is able to do so, "the remaining question is whether that reason was

simply a pretext designed to mask discrimination."  *Jones v. Potter*, 488 F.3d 397,

406 (6th Cir. 2007).  "Under this scheme, the plaintiff retains the ultimate burden

of persuasion at all times."  *Monette*, 90 F.3d at 1186-87.  "[T]he plaintiff must

produce sufficient evidence from which the jury may reasonably reject the

employer's explanation.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d

1078, 1083 (6th Cir. 1994).

The FMLA makes it unlawful "for any employer to discharge or in any other

manner discriminate against any individual for opposing any practice made

---

[2] Because the *McDonnell Douglas* burden shifting framework -- discussed in detail
below -- applies to both types of claim, this distinctions turns out to be merely a
semantic one.  *See, e.g., Donald*, 667 F.3d at 761-62.

unlawful by" the FMLA.  29 U.S.C. § 2615(a)(2).  To establish a *prima facie* claim

of FMLA retaliation, Plaintiff must establish that

> (1) she was engaged in an activity protected by the FMLA; (2) the
> employer knew that she was exercising her rights under the FMLA;
> (3) after learning of the employee's exercise of FMLA rights, the
> employer took an employment action adverse to her; and (4) there was
> a causal connection between the protected FMLA activity and the
> adverse employment action.

*Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Defendant nearly concedes that Plaintiff has established a *prima facie* case -- it

accepts that there was a relatively striking temporal connection between Plaintiff's

statements to Engstrom regarding her planned surgery and her subsequent

termination -- but makes a cursory argument that "[t]he Sixth Circuit . . . has

accepted temporal proximity as a valid basis from which to draw an inference of

retaliatory motivation under limited circumstances" but has "caution[ed] about the

permissibility of drawing an inference of causation from temporal proximity

alone."  Def.'s Mot. for Summ. J., at 14 n.10 (quoting *Vereecke v. Huron Valley

Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)).

To satisfy the causal connection element, a plaintiff "must produce sufficient

evidence to support an inference that [the defendant] took the adverse employment

action because" the plaintiff engaged in protected activity.  *Ozier v. RTM

Enterprises of Georgia, Inc.*, 229 Fed. App'x. 371, 377 (6th Cir. 2007); *see also*

12

*Taylor v. Bd. of Educ. of Memphis Schools*, 240 Fed. App'x. 717, 720 (6th Cir. 2007); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

The Sixth Circuit has made clear that "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (internal quotation marks omitted). And, at the *prima facie* stage, even the case that Defendant itself relies upon heavily in its pretext argument, discussed below, concedes that the Sixth Circuit has "concluded that temporal proximity alone is sufficient to establish a *prima facie* case of FMLA retaliation." *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5 (6th Cir. 2012); *see also Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002) (stating that, in the FMLA context, "[p]roximity in time can raise a *prima facie* case of retaliatory discharge"); Judge v. Landscape Forms, Inc., 592 F. App'x 403, 409 (6th Cir. 2014) ("We have held that the causal connection between the protected activity and the adverse employment action necessary for a *prima facie* case of retaliation can be established solely on the basis of close temporal proximity."). Accordingly, the Court finds that Plaintiff has established evidence sufficient to support a *prima facie* case of FMLA retaliation.

Accordingly, Plaintiff has successfully shifted the burden to Defendant to establish a legitimate, nondiscriminatory reason for Plaintiff's termination. The parties appear to agree that Defendant has done so by articulating Plaintiff's

13

longstanding history of poor sales performance.  *See* Pl.'s Resp. to Def's. Mot. for

Summ. J., at 11 (moving directly to the pretext issue).  Thus, the final step requires

Plaintiff to demonstrate that Defendant's proposed explanations for her termination

were merely pretextual.  As the Sixth Circuit has recently articulated,

> A plaintiff may prove a reason false by showing that it (1) had no
> basis in fact, (2) did not actually motivate the employer's action, or
> (3) was insufficient to motivate the employer's action.  These three
> categories are simply a "convenient way of marshaling evidence and
> focusing it on the ultimate inquiry: did the employer fire the employee
> for the stated reason or not?"

*Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 503 (6th Cir. 2013) (citation

omitted) (quoting  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012));

*see also Manzer*, 29 F.3d at 1084 (same); *Chen v. Dow Chem. Co.*, 580 F.3d 394,

400 (6th Cir. 2009) ("To carry her burden in opposing summary judgment, [a

plaintiff] must produce sufficient evidence from which a jury could reasonably

reject [the employer's] explanation of why it fired her").

Plaintiff's primary arguments relate to the second and third categories of

demonstrating pretext.  First, she argues that "a question of fact exists whether

Defendant terminated Plaintiff's employment in violation of its policies and

practices regarding performance counseling."   Pl.'s Resp. to Def.'s Mot. for

Summ. J., at 11.  In effect, she argues that her performance issues were insufficient

to motivate her termination.  Her only evidentiary support for this claim is her own

14

deposition testimony, in which she stated that her understanding of Defendant's performance counseling policy was

> [t]hat you had to be under 70 percent to goal three months in a row and then you would go on a performance counseling. Actually, you know, you would work with your employee first with an action plan, a performance action plan to try to help them move up. That would be your first step. Or actually, probably the first thing, yes, the first thing would be a verbal, you know, it looks like we've got a little bit of issue here, we need to start working on some things. And sometimes that's all it takes.
>
> Then you go to a performance action plan. And then if things still don't improve after three months of 70 percent or less to goal, and I wouldn't wait until somebody was 70 percent or less to goal before I would start the other actions. And then when you move to a performance counseling after three months you're on a probationary period of six months, and if you, if things begin to improve then at six months you're off of that unless you hit another three months in a row of 70 percent less to goal.

Johnson Dep., at 174. Other parts of Plaintiff's deposition testimony likewise convey her understanding that, so long as an employee was six months removed from a prior Performance Counseling, she could not be terminated for being given a subsequent one. *Id.* at 142-32, 48-49. She testified that she gained this understanding from Lucas, which Lucas denied. *Id.* at 178-79; Lucas Decl. ¶ 7. And because, at the time of Plaintiff's termination, she had not received a Performance Counseling since July 2013, she argues that Defendant's performance was not a legitimate ground to terminate her.

Plaintiff's testimony, however, is not supported by any evidence that Defendant had such a policy restricting its ability to terminate underperforming employees. Indeed, Defendant has produced documentation regarding its disciplinary policy that explicitly contradicts Plaintiff's assertion, though some language is similar to Plaintiff's description. Fifth Third's November 2013 "Performance Counseling" documentation from human resources states, in relevant part:

> Employees should be satisfactorily performing in their current job before being considered for other opportunities within Fifth Third. For that reason, employees who have received written counseling within the preceding six (6) month period prior to posting may be limited or prohibited from posting or being considered for other positions within Fifth Third, depending on the nature and severity of the performance issue. Because performance counseling is only conducted when performance has failed to meet expectations, counseling and the employee's subsequent performance will also be considered during the annual performance review process.

> If an employee does not take the recommended performance improvement steps, performance does not improve, and/or additional performance issues arise, further counseling or disciplinary action, up to and including termination, may occur.

> *Nothing contained in this policy, or in any other Fifth Third policy, should be construed to alter the at will employment relationship or create a progressive discipline policy or practice. (Also see the At-Will Employment Policy.)* Fifth Third reserves the right to utilize whichever counseling method and form is appropriate under the circumstances.

16

Human Resources, November 2013 Performance Counseling, Dkt. # 18-12, Ex. A. (emphasis added). Plaintiff has no response to this document, and has presented no evidence of the rigid termination policy that she suggested in her deposition.

Plaintiff's second argument regarding pretext requires more consideration. She notes the fact that her termination "occurred within a matter of two . . . weeks of her providing notice of her need for FMLA-qualifying leave," and states that it is "clear that suspicious timing is a strong indicator of pretext." Pl.'s Resp. to Def.'s Mot. for Summ. J., at 12 (quoting *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App's 387, 393(6th Cir. 2005). Defendant does not deny this intuitive conclusion, but instead cites to cases standing for the proposition that "temporal proximity is insufficient *in and of itself* to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (emphasis added). Defendant relies heavily on *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1 (6th Cir. 2012), another FMLA retaliation case in which the plaintiff, an insurance claims adjustor, had experienced numerous problems with job proficiency, including failing to show up for work, failing to complete necessary paperwork, and failing to respond to telephone and email messages. *Id.* at *1-2. After about one year of these problems, the plaintiff "began to experience symptoms of a heart attack" and "advised [his employer] that he was going to the

17

hospital and requested a medical leave of absence" of about two months, which his employed granted. *Id.* at *2. Following this leave, the plaintiff returned to work and had several discussions with his employer about his poor performance and non-health-related absences, and requested further leave about a month later for a follow-up surgery. *Id.* at *3. Shortly after the request, Plaintiff was terminated. *Id.* The court noted that that "[t]his Circuit has not adopted a uniform approach on whether a causal connection may be established solely on the basis of temporal proximity," and explained that the current law indicates that temporal proximity alone can be sufficient to establish the *prima facie* case but not to establish pretext in the *McDonnell Douglass* analysis. *Id.* at *5. Based on this, the Sixth Circuit held that Plaintiff's temporal proximity argument was not enough to survive summary judgment, because "[a]lthough Plaintiff has established a close temporal proximity between his request for medical leave and his discharge, Defendant provided a legitimate, non-discriminatory reason for terminating Plaintiff's employment -- namely that Plaintiff was released due to a nationwide staff reduction at GAB Robins and would have been released even if he had not taken medical leave." *Id.* at *5-6.

Several other Sixth Circuit cases, both in the FMLA context and other retaliation contexts, also make clear that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging

an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001); *see also Landscape Forms, Inc.*, 592 F. App'x at 411 (6th Cir. 2014) ("[U]nder our precedent temporal proximity alone is insufficient to establish pretext."); *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012) ("Unlike its role in establishing a *prima facie* case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext. However, suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." (internal quotation marks and citations omitted)); *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (stating that, in the First Amendment retaliation context, "we have found that the temporal proximity between . . . filing . . . grievances and the [adverse action] provides some circumstantial support for a causal connection but have been reluctant to find that such evidence without more can demonstrate that the filing of grievances was a substantial or motivating factor.") (internal quotation marks and citations omitted); *Parnell v. West*, 114 F.3d 1188 (6th Cir. 1997) (same in the Title VII context).

Though this body of law appears to govern the instant case, the Court finds it necessary to note several difficult aspects of its application here. First, the Sixth Circuit has not explained the correct application of *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013) to the FMLA retaliation context, either at the prima *facie stage* or the pretext stage. Nassar, of

19

course, famously held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a *but-for cause* of the alleged adverse action by the employer." *Nassar*, 133 S. Ct. at 2534 (emphasis added). This holding, in effect, eviscerated so-called "mixed-motive" Title VII retaliation claims in which the plaintiff is able to establish that the employment action was motived by a mix of lawful and unlawful considerations. Because of the difference in statutory language between Title VII and the FMLA, however, it is unclear whether *Nassar*'s holding affects the FMLA retaliation analysis.

The Sixth Circuit gave at least some indication that *Nassar* should be cabined to the Title VII context when it noted -- after *Nassar* was decided -- that "the typical examination of pretext, which is geared toward single-motive claims, is only imperfectly applicable to mixed-motive cases. In a mixed-motive case, even if the employer's FMLA-neutral reason did have a basis in fact, did motivate the employer's action, and was sufficient on its own to motivate the employer's action, a mixed-motive FMLA plaintiff may still withstand summary judgment so long as her exercise of her FMLA rights also contributed to the employer's action." *Wallner v. Hilliard*, 590 F. App'x 546, 556 (6th Cir. 2014). The Sixth Circuit has held that in such cases, the Supreme Court's burden-shifting framework from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), applies, which differs from the *McDonnell Douglas* analysis in that, after the plaintiff has demonstrated a prima

20

2:14-cv-13121-GER-RSW   Doc # 22   Filed 12/30/15   Pg 21 of 30   Pg ID 469

facie case, the defendant must "prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 692 (6th Cir. 2009) (internal quotation marks omitted). Critically, however, Plaintiff here has failed to make any argument or statement, in either her complaint or her briefing, that her claims are mixed-motive in nature, [3] that *Price Waterhouse* applies, or that the *McDonnell Douglass* framework should not be applied. Indeed, she seems to accept the application of *McDonnell Douglass*, repeatedly referring to its terminology in attempting to demonstrate that Defendant's offered reasons for her termination were "pretextual."

Even applying *McDonnell Douglass*, however, the Court further notes that it is difficult to deny that the temporal proximity between Plaintiff's request for leave and her termination provides particular indication of pretext in this case. While the case bears many similarities to *Krumheuer* and other cases like it, there are several important distinctions. Here, Plaintiff experienced performance difficulties over a fairly long period of time -- approximately three years. While the extent and duration of her performance problems may, in some ways, serve to buttress Defendant's claims that it clearly had an independent valid reason to terminate

---

[3] For example, in her Complaint, Plaintiff affirmatively asserts that "the reasons for Plaintiff's termination are pretextual in nature" and that "the reasons for Plaintiff's termination are not based in fact and/or *did not actually motivate* the decision to terminate her employment." Pl.'s Compl. ¶¶ 46-47 (emphasis added).

Plaintiff, they also undercut Defendant's theory in that Defendant could have justifiably terminated Plaintiff at nearly any point along the line if it was particularly concerned with her sales numbers, but did not do so.  The fact that she was given opportunity after opportunity to improve, but was only terminated just after she raised the issue of leave, naturally raises a question as to the motivation of her termination.  In short, the Court is leery of the blanket determination that temporal proximity alone can never provide sufficient evidence of pretext to survive summary judgment.  Imagine, for example, that Defendant terminated Plaintiff merely ten minutes after Plaintiff explained to Engstrom that she would have to take leave for her surgery.  The Court is highly skeptical of the notion that no reasonable juror in such a case could find that Defendant's stated reasons for terminating Plaintiff were merely pretextual.

But regardless of the strength of Plaintiff's temporal proximity argument, the requirement that Plaintiff must establish some other indicator of pretext in order to survive summary judgment appears to be inescapable in the present circumstances. Indeed, Plaintiff does not even argue in her brief that her temporal proximity argument alone should be sufficient; instead she focuses on her claims that she has other evidence of pretext in addition to temporal proximity.  However, the Court agrees with Defendant that her three other arguments as to pretext are unavailing.

22

First, Plaintiff asserts that Engstrom testified inconsistently in his deposition for this case and that "inconsistencies in . . . testimony provide further evidence of pretext."  Pl.'s Resp. to Def.'s Mot. for Summ. J., at 13.  Plaintiff correctly notes that, in his deposition, Engstrom initially testified that he had discussed Plaintiff's potential leave with Hotchkiss *before* terminating Plaintiff.  Engstrom Dep., at 26-27.  However, Engstrom later corrected himself, explaining that this discussion with Hotchkiss occurred *after* Plaintiff filed her lawsuit.  *Id.* at 38.  Engstrom's corrected version was corroborated by Hotchkiss's testimony at his deposition.  Hotchkiss Dep., at 6.  In arguing that Engstrom's error provides evidence of pretext, Plaintiff cites to *Cichewicz v. UNOVA Indus. Auto. Sys., Inc.*, 92 F. App'x 215, 220 (6th Cir. 2004), but that case stands for the proposition that "evidence of pretext may consist of a defendant's changing explanations" as to the *reason for the termination itself*, not merely inconsistent testimony during a deposition.  *Id.* at 220-221.  Indeed, in that case, the plaintiff was given multiple contradictory reasons for his termination, and record evidence -- such as press releases made by the defendant -- discredited some of the explanations.  *See id.*  Such evidence naturally evinces pretext -- when the Defendant cannot gets its story straight as to the actual reason for termination of the plaintiff, a juror has good reason to question whether the stated reasons actually motivated the termination.  In contrast, this case involves a comparatively harmless misstatement during a deposition that

23

the deponent promptly corrected, and that misstatement was not related to the reasons for Plaintiff's termination.  Defendant has remained entirely consistent throughout this litigation that it terminated Plaintiff because of her poor sales performance.  Plaintiff has pointed to no authority indicating that an error like the one made by Engstrom evinces pretext in employment termination.

Plaintiff also asserts that Defendant "failed to provide Plaintiff with an [FMLA] eligibility notice and a rights and responsibilities notice, even though Plaintiff related sufficient information to Defendant for it to understand that Plaintiff's requested leave may be FMLA-qualifying."  Pl.'s Resp. to Def.'s Mot. for Summ. J., at 13.  Defendant responds that Plaintiff "never requested FMLA leave."  Def.'s Reply, Dkt. # 21, at 6.  But even assuming that Plaintiff *did* request FMLA leave, she does not cite to any authority indicating that Defendant's failure to provide an eligibility notice here would evince pretext.  She relies on *Scorsone v. Wal-Mart Stores, Inc.*, No. 13-CV-14418, 2014 WL 2207002 (E.D. Mich. May 28, 2014), an entirely inapposite case that involved a plaintiff who was already on FMLA leave and did not receive proper notice.  There is no reason to infer, because Defendant here did not provide Plaintiff with FMLA eligibility information after she briefly noted time she would need off months in the future, that Defendant's reasons for terminating Plaintiff were merely pretextual.

24

Last, Plaintiff relies on the fact that Thomas Lynch was given the opportunity to resign, rather than be terminated, is evidence of retaliation. Pl.'s Resp. to Def.'s Mot. for Summ. J., at 14. In support, she relies on *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999). In that case, after the plaintiff filed a racial discrimination complaint with the EEOC,

> his supervisor and the other employees began to avoid him and would not talk to him. Plaintiff testified that this isolation began in January 1995 and continued until he quit in 1996. For example, plaintiff and others testified that [Plaintiff's supervisor] told the employees to move their tool boxes from the back of the shop, where plaintiff was located, so they wouldn't talk to plaintiff. In addition, [other employees] were removed from the friction welding department, leaving plaintiff as the only employee in that department.

*Id.* at 1078. The court subsequently held that "[t]he causal connection between the adverse employment action and the protected activity . . . may be established by . . . showing that [the plaintiff] was treated differently from other employees." *Id.* at 1080. Such a circumstance is a far cry from this case, where Plaintiff's performance issues were entirely distinct from those of Lynch and reasonably warranted different approaches. Plaintiff has provided no evidence of systematic differential treatment that would imply Plaintiff's termination was pretextual, in stark contrast with *Moore*.

In whole, analysis of this claim is difficult because, as discussed above, the Court finds Plaintiff's temporal proximity argument particularly strong. The Court is bound, however, by the law of the Circuit, which makes clear that temporal

proximity alone is not enough to evince pretext sufficiently to survive summary judgment.   And, as explained, Plaintiff has failed to demonstrate any other evidence of pretext.   Accordingly, the Court will grant summary judgment on Plaintiff's Count I.

## B.    Age and Gender Discrimination Claims

Plaintiffs second and third Counts allege age and gender discrimination, in violation of the Elliott-Larsen Civil Rights Act.   That Act provides, in relevant part, that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." M.C.L. § 37.2201(a)(1).

In the absence of direct evidence of discrimination, which Plaintiff does not allege here, the analysis proceeds under the *McDonnell Douglas* framework as applied above.  *E.g., Maletich v. La-Z-Boy Inc.*, No. 11-14615, 2013 WL 3328302, at *12 (E.D. Mich. July 2, 2013).  In order to establish a *prima facie* case of either age or gender discrimination, a plaintiff must prove by a preponderance of the evidence that "he was (1) a member of protected class, (2) subject to an adverse employment action, (3) qualified for the position from which he was rejected or

terminated, and (4) either replaced by a person from outside the protected class or treated differently than a similarly-situated employee from outside the protected class." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997).

In its Motion, Defendant strangely argues that Plaintiff must further prove that "that the person who discharged [Plaintiff] was predisposed to discriminate against persons in the affected class and had actually acted on that disposition in discharging him." *Singal v. Gen. Motors Corp.*, 447 N.W.2d 152, 156 (1989); Def.'s Mot. for Summ. J., at 20. But, as Plaintiff notes, this is a requirement for a claim of *intentional* discrimination under the Act, not a *disparate treatment* claim -- which is the type of claim Plaintiff makes here with regard to both age and gender discrimination. Accordingly, Defendant's arguments that Plaintiff was never subjected to ageist or sexist remarks during her employment, while factually true, are irrelevant to Plaintiff's claims. *See* Def.'s Mot. for Summ. J., at 20-22.

But even presuming that Plaintiff has made out a *prima facie* case of age discrimination, Defendant has shifted the burden of production back to Plaintiff by providing a legitimate reason for her termination, as described above. And, as discussed above, Plaintiff has done nothing to demonstrate that Defendant's motivation was pretextual. Her strongest argument as to pretext in the FMLA

27

context -- temporal proximity to her request for leave -- is irrelevant in the age discrimination context. She provides no other evidence of pretext, and as courts have held, "replacement by a younger employee, without more, is insufficient" to rebut legitimate, nondiscriminatory reasons for discharge. *Barnell v. Taubman Co.*, 512 N.W.2d 13, 19 (Mich. Ct. App. 1993). Accordingly, the Court will grant summary judgment on Plaintiff's age discrimination claim.

Plaintiff's gender discrimination claim does not fare any better. She argues that gender discrimination is evinced because Lynch, a male, was allowed to resign his position whereas Plaintiff was not. But Plaintiff cannot establish even a *prima facie* case of gender discrimination because she cannot show that she was similarly situated with Lynch. As the Sixth Circuit has explained,

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated in all respects. Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted). Plaintiff is quick to respond that the Sixth Circuit has clarified and somewhat tempered this language, noting that "[a]lthough [the language of *Mitchell*] appears to invite a comparison between the employment status of the plaintiff and other

28

employees in every single aspect of their employment, *Mitchell* has not been so narrowly construed." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The court has further explained that the "plaintiff must prove that all of the *relevant* aspects of his employment situation are nearly identical to those of the . . . employees who he alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (internal quotation marks omitted).

Even interpreting this language in its broadest possible form, Plaintiff cannot establish that she was similarly situated with Lynch in the relevant aspects of her employment. Critically, the alleged reasons for termination of Plaintiff and Lynch were strikingly different -- Plaintiff was terminated based on longterm problems in her sales performance, whereas Lynch was terminated based on a single significant incident, because of which the bank decided it could not risk keeping Lynch on. As Engstrom explained in his deposition, Lynch's incident was "out of the blue" and "unexpected for him," and accordingly, Defendant preferred to allow him to resign to minimize the eventual damage to his career. This distinction is undoubtedly relevant to the differential treatment between Plaintiff and Lynch, and accordingly, the two were not similarly situated. *See, e.g.*, *Maletich*, 2013 WL 3328302, at *13 (conducting similar analysis based on whether employees engaged in the same or similar conduct).

29

Last, and in the alternative, even if Plaintiff could establish a *prima facie* gender discrimination claim, Defendant has provided a legitimate reason for Plaintiff's termination, and she has not provided any evidence indicating that this reason was merely a pretext for gender-motivated discrimination. Accordingly, the Court will grant summary judgment on Plaintiff's gender discrimination claim.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 18) is **GRANTED**.

IT IS FURTHER ORDERED that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated:  December 30, 2015          s/Gerald E. Rosen
                                   Chief Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 30, 2015, by electronic and/or ordinary mail.


                        s/Julie Owens
                        Case Manager, (313) 234-5135